IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

EVERETT HENDERSON,          :
                            :
        Plaintiff,          :
                            :
vs.                         :          5:09-CV-85 (CAR)
                            :
FEDEX EXPRESS,              :
                            :
        Defendant.          :
_____

*ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

Following his dismissal for the fatal company offense of falsification, Plaintiff alleged race discrimination as well as retaliation and disability discrimination and retaliation. Defendant moved for Summary Judgment [Doc. 37]. As a matter of law, Plaintiff has not shown that Defendant treated him any differently than a similarly situated non-African-American for the same misconduct. Nor has Plaintiff demonstrated any causal link between his protected conduct and his dismissal or presented the Court with any evidence that he suffered from a disability at that time. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

Plaintiff Everett Henderson was fired from his job at Defendant Federal Express's ("FedEx") Macon Station facility on September 28, 2005, after video surveillance and an ensuing investigation indicated he had falsified his company time card. FedEx maintains a zero-tolerance policy with regard to any falsification of company documents. Plaintiff, however, claims that his termination resulted from discriminatory retaliation in two different respects.

First, Plaintiff claims race discrimination and retaliation in violation of the Civil Rights

Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.* Over the nearly two decades of his employment with FedEx, Plaintiff, who is African-American, had filed many internal and external grievances alleging various discriminatory practices at the company, all of which were apparently handled according to the appropriate procedures.

Second, Plaintiff claims discrimination and retaliation pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Although his physician had cleared him for full-time work after he spent most of the summer of 2005 on medical leave, Plaintiff believes his managers at FedEx were inflexible in accommodating his desire to pursue ongoing physical therapy during an extended lunch break.

The record shows that Plaintiff cannot create a genuine issue of material fact to support his conclusion that any alleged time card falsification was mere pretext for his firing, which he believes is best explained by either or both of the above discriminatory motivations.

Plaintiff's termination at FedEx for time card falsification

Early in September 2005, FedEx management in Macon began investigating employee reports that two customer service agents were falsifying time cards. (Deposition of Bryan Evans, taken December 5, 2006 ("Evans Dep. II"), pp. 121-22; Britton Dec. at ¶¶ 8-11; Declaration of Tad Fuqua, dated August 25, 2008 ("Fuqua Dec."), ¶¶ 5-8). During the night of September 21, 2005, management and security personnel installed a surveillance camera in the time clock area of the station. (Evans Dep. II at pp. 121-22; Declaration of Michael S. Britton, dated August 25, 2009 ("Britton Dec."), ¶ 11; Fuqua Dec. at ¶¶ 6-8). Shortly after the start of the morning shift on September 22, 2005, three managers observed Plaintiff arrive from the parking lot without first clocking in to join a meeting already in progress. (Evans Dep. II at pp. 110-20; Britton Dec. at ¶¶

2

12, 15, Ex. 1; Fuqua Dec. at ¶ 9).

Later that afternoon, Plaintiff's immediate supervisor Bryan Evans ("Evans"), who is white, audited the time card Plaintiff submitted that day. (Evans Dep. II at pp. 120-21; Britton Dec. at ¶ 12). The time card reflected a clock-in time of 7:14 a.m. (Evans Dep. II at pp. 120-21; Britton Dec. at ¶¶ 15-16, Ex. 1, 3; Fuqua Dec. at ¶ 11). At the bottom, Plaintiff certified by his signature that all of the information on his FedEx time card was accurate, and he thereby acknowledged that falsification of the time card was a terminable offense. (Deposition of Everett Henderson, taken December 4, 2006 ("Henderson Dep. II"), p. 127, Ex. O; Britton Dec. at ¶ 16, Ex. 3).

When Evans and other managers viewed the surveillance video, Plaintiff had not clocked in at 7:14 a.m. or at any other time during the morning of September 22, 2005. (Henderson Dep. II at p. 100; Evans Dep. II at pp. 120-21, 123-25; Britton Dec. at ¶¶ 13-16 Ex. 1, 3; Fuqua Dec. at ¶¶ 10-13). Instead, the surveillance video showed another African-American employee, Greg Barnes ("Barnes"), approach the time clock and punch a document at 7:14 a.m. (Evans Dep. II at pp. 124-25; Britton Dec. at ¶ 13, 15, Ex. 1; Fuqua Dec. at ¶ 11). Barnes first appeared on the surveillance video at 6:41 a.m. when he punched his own time card, which he later submitted at the end of the day. (Evans Dep. II at p. 124; Britton Dec. at ¶ 13, 15, Ex. 1; Fuqua Dec. at ¶ 13). Plaintiff did not appear in the surveillance video until mid-afternoon on September 22, 2005, when he clocked out for the day. (Evans Dep. II at p. 125; Britton Dec. at ¶ 13, 15, Ex. 1; Fuqua Dec. at ¶ 13). One other employee, Scotty Barron, appeared on the video to time-stamp a document at 7:14 a.m., but that document was accounted for by management, which verified that Barron had duly submitted it later in the day. (Britton Dec. at ¶¶ 15-16, Ex. 1, 4; Fuqua Dec. at ¶ 12).

3

In light of the strong indication that Barnes had clocked in for Plaintiff so that Plaintiff would not appear late, management placed both on paid investigative suspension on September 23, 2005. (Henderson Dep. II at p. 133, Ex. R; Deposition of Everett Henderson, taken April 15, 2008 ("Henderson Dep. III"), pp. 163-66, 170-72; Evans Dep. II at pp. 126-28, 132-33; Britton Dec. at ¶ 14).  Plaintiff refused to cooperate in the ensuing investigation. (Henderson Dep. III at pp. 159-61; Evans Dep. II at pp. 129-32, 135-36; Britton Dec. at ¶ 14). After considering the behavior of Plaintiff and Barnes that management had observed in person and on the surveillance tape, the time cards both had submitted, and Plaintiff's lack of participation during their investigation of his conduct, Evans and Senior Manager Michael Britton ("Britton"), who is also white, concluded that Plaintiff had deliberately misrepresented his start time on the September 22 time card. (Evans Dep. II at pp. 108, 110-21, 123-34; Britton Dec. at ¶¶ 12-17, Ex. 1-4).

At the direction of FedEx Human Resources and their Managing Director, Evans and Britton fired Plaintiff on September 28 pursuant to FedEx's "zero tolerance" policy on falsification of company documents. (Henderson Dep. II at pp. 124-26, 137, 149-50, Ex. N, P; Henderson Dep. III at pp. 45-46, 103, 167-68; Evans Dep. II at pp. 33, 37, 99, 101-05, 108, 128-31, Ex. 5, 10-11; Deposition of Michael Britton, taken July 10, 2008 ("Britton Dep."), pp. 24-25; Britton Dec. at ¶¶ 5, 17-18, Ex. 6; Webster Dec. at ¶¶ 4, 7-8, Ex. 1, 4).  Pursuant to the same non-discretionary policy, managers Evans and Britton testified that they have fired white employees who similarly falsified company documents. (Evans Dep. III at pp. 71-74, 118-19, Ex. 19; Britton Dec. at ¶ 19, Ex. 7-9).  Barnes was also fired for his part in the falsification of Plaintiff's time card. (Evans Dep. III at p. 74; Britton Dec. at ¶ 17; Declaration of Oscar

4

Webster, dated August 24, 2009 ("Webster Dec."), ¶¶ 4, 7, Ex. 1, 4).

Over the years of his employment, Plaintiff received several copies of FedEx's Employee Handbook and was given access to FedEx's People Manual, both of which governed his employment with FedEx. (Henderson Dep. II at pp. 189, 195, Ex. DD-FF, LL-NN; Deposition of Susan Sweat, taken July 9, 2008 ("Sweat Dep."), pp. 102-03, 154-58, Ex. 6-9; Webster Dec. at ¶¶ 4-8, Ex. 1-4).  He also had a copy of FedEx's Acceptable Conduct Policy and was notified in February 2005 and in August 2005 that FedEx had revised this policy to make deliberate falsification of company records a terminable offense. (Henderson Dep. II at pp. 124-26, 149-50, 189, 195, Ex. N, DD, GG, LL-NN; Henderson Dep. III at pp. 45-46, 103, 142-43, Ex. 9; Sweat Dep. at pp.103-05; 152-53, 155-57, Ex. 5, 7; Deposition of Bryan Evans, taken July 10, 2008 ("Evans Dep. III"), pp. 30-31, 33, 37, 99, 104-05, Ex. 5, 10-11; Webster Dec. at ¶¶ 4, 7-8, Ex. 1, 4; Britton Dec., ¶ 18, Ex. 5-6).  FedEx's Time Card Policy requires its employees to perform all personal time card-related activities individually, including recording start and stop times, and it warns that having another employee complete one's time card and falsification of one's own time card were serious offenses, which could result in termination. (Henderson Dep. II at p. 189, 197-95, EE, LL-NN; Webster Dec. at ¶¶ 5, 7-8, Ex. 2, 4).

Plaintiff's long history of employment-related grievances against FedEx

Plaintiff had worked at FedEx's Macon Station since 1988. (Henderson Dep. II at p. 7, Ex. C; Henderson Dep. III at pp. 154-55, Ex. 14)  FedEx promoted him to courier just a year after he joined the company. (Henderson Dep. II at p. 7).  Plaintiff received good performance reviews throughout his employment with FedEx, and he was never disciplined for his job performance.  He was only reprimanded for two incidents of unrelated misconduct. (Deposition

of Everett Henderson, taken November 9, 2006 ("Henderson Dep. I"), p. 57; Henderson Dep. II at pp. 119, 190, Ex. K, GG; Henderson Dep. III at pp. 140-43, Ex. 7-9; Deposition of Bryan Evans, taken November 9, 2006 ("Evans Dep. I"), pp. 48-49).

Beginning around 1990, Plaintiff began to utilize FedEx's internal Guaranteed Fair Treatment ("GFT") Procedure and Equal Employment Opportunity ("EEO") Process and contested numerous employment decisions over the years that he felt were unfair or racially discriminatory or otherwise inappropriate. (Henderson Dep. I at pp. 91-98; Henderson Dep. II at pp. 31-34, 45-46, 117, 189, 191-92, Ex. J, FF, HH; Henderson Dep. III at pp. 98, 120-22, 147-48; Sweat Dep. at pp. 33-40, 72-75, 79-82, 89-92, 94, 157-57, 169-70, 174-75, Ex. 8-9, 16, 18; Webster Dec. at ¶¶ 6-8, Ex. 3-4). During his employment with FedEx, Plaintiff also filed several complaints about Defendant with government agencies, including the National Labor Relations Board and the Equal Employment Opportunity Commission. (Henderson Dep. II at pp. 183-84; Henderson Dep. III at pp. 128, 150-53, Ex. 11-13).

Most pertinent to this case is a grievance filed by Plaintiff on March 21, 2005, pursuant to FedEx's EEO Process, alleging that Evans, his supervisor, had told Macon employees several crude jokes on the topic of sex. (Henderson Dep. II at p. 117, Ex. J; Webster Dec. at ¶¶ 6-7, Ex. 3-4; Declaration of Robert Dean, dated August 25, 2009 ("Dean Dec."), ¶¶ 4-5.). FedEx investigated the complaint and disciplined Evans for his participation in the conversation. (Evans Dep. I at pp. 32-37, 41-43, 45; Evans Dep. II at pp. 6-7; Evans Dep. III at pp. 62-64, 118, Ex. 17; Sweat Dep. at pp. 160-62, Ex. 11; Dean Dec. at ¶¶ 4-8).

Additionally, a FedEx Human Resources Representative interviewed Plaintiff on September 14, 2005, as part of her investigation of an unrelated complaint filed by another

employee. (Henderson Dep. I at pp. 86-87; Henderson Dep. II at pp. 78-81, 187-88; Henderson

Dep. III at p. 89, 96; Declaration of Mari Kristine Peasley, dated August 25, 2009 ("Peasley

Dec."), ¶¶ 4-10, Ex. 1-2).  During a wide-ranging discussion, Plaintiff complained that his

managers were dishonest, that packages containing hazardous materials may have been

transported without proper credentials, and that his manager was preventing him from going to

physical therapy. (Henderson Dep. I at pp. 87-89; Henderson Dep. II at pp. 187-88; Henderson

Dep. III at pp. 88-90.).

Through FedEx's GFT Procedure and its EEO Complaint Process, Plaintiff contested his

termination, which was upheld by three levels of upper management. (Henderson Dep. II at pp.

151-55, 169, 176-77, 169-70, Ex. S-W, Y-AA; Henderson Dep. III at p. 123-24, 158, Ex. 17;

Sweat Dep. at pp. 72-75, 79-82, 89-92, 94; Webster Dec. at ¶¶ 6-7, Ex. 3-4).  Plaintiff did not

express a belief that he was fired because of race discrimination or retaliation related to his prior

EEO complaints until he reached Step III in the GFT process, more than a month after his

discharge. (Henderson Dep. II at pp. 169-70, Ex. Y-Z).  Plaintiff also admits he never heard

Evans or Britton make racially discriminatory comments. (Henderson Dep. III at pp. 98-99,

101).

Plaintiff's request for time-off to attend physical therapy

Plaintiff spent much of the summer of 2005 on medical leave, but his physician released

him to return to work full-time on August 28, 2005. (Henderson Dep. I at pp. 77-78, 82-83;

Henderson Dep. III at pp. 36-37; Declaration of Bryan Evans, dated August 24, 2009 ("Evans

Dec."), ¶ 4; Declaration of Tim Jones, dated August 24, 2009 ("Jones Dec."), ¶¶ 5-7, Ex. 2;

Britton Dec. at ¶ 7.).  At no point had any medical doctor classified Plaintiff as "disabled" or as

unable to work in September 2005. His own self-assessment, however, at that time was that he could not do the "job like [he] really needed to." (Henderson Dep. I at pp. 77-78; Henderson Dep. III at pp. 35-37, 36 (ll. 8-9), 41, 87-88, 90-91).

Defendant instructed Plaintiff to try to schedule appointments with his medical providers outside his assigned work hours. (Henderson Dep. III at pp. 156-58, Ex. 16; Jones Dec. at ¶ 6, Ex. 1). Plaintiff's workday normally ended between 3:00 and 4:00 p.m. (Henderson Dep. I at p. 61). On September 16, 2005, Plaintiff claims supervisor Evans refused his request for an extended lunch break three days a week in order to attend physical therapy. (Henderson Dep. II at p. 64; Henderson Dep. III at pp. 83-85, 87, 92-94, 154-55, Ex. 5, 14). Both Evans and manager Britton, however, had previously accommodated Plaintiff's requests for schedule changes for personal reasons. (Henderson Dep. I at pp. 7-8; Henderson Dep. III at pp. 149-50, Ex. 10; Evans Dep. II at pp. 8-10).

As discussed above, Plaintiff complained that his manager had prevented him from going to physical therapy during his interview with Human Resources on September 14, 2005. But Plaintiff admits that Evans never mentioned the interview or said anything of a retaliatory nature to Plaintiff in this regard. (Henderson Dep. III at p. 95.). As previously noted, Plaintiff also admits he never heard Evans or Britton make racially discriminatory comments. (Henderson Dep. III at pp. 98-99, 101).

Since his dismissal from FedEx, Plaintiff has held several jobs as a delivery driver, trucking supervisor, customer service representative, and a patient account representative. (Henderson Dep. I at pp. 16-24; Henderson Dep. III at pp. 11-12, 16-17, 19-22). Plaintiff's education includes a college degree and additional course-work in business administration.

(Henderson Dep. I at pp. 27-31; Henderson Dep. III at p. 16).

## LEGAL STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).  The substantive law applicable to the case determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.  See id. at 247-48.  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The movant carries the initial burden and must show the court that "an absence of evidence to support the nonmoving party's case" exists to sustain its motion. Celotex, 477 U.S. at 325.  "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

But the nonmoving party must then go beyond the pleadings and present specific

evidence, which raises a genuine issue of material fact (i.e., evidence that would support jury

verdict), or otherwise show that the moving party is not entitled to judgment as a matter of law.

See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.  This evidence must consist of

more than mere conclusory allegations or legal conclusions and may include affidavits,

depositions, admissions, and the like. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

Moreover, "mere conclusions and unsupported factual allegations, as well as affidavits based, in

part, upon information and belief, rather than personal knowledge, are insufficient to withstand a

motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005).

Summary judgment must then be entered where "the nonmoving party has failed to make a

sufficient showing on an essential element of [her] case with respect to which [she] has the

burden of proof." Celotex, 477 U.S. at 323.

Plaintiff only responded in part to Defendant's Motion for Summary Judgment.  To grant

summary judgment, the Court must find that the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c).  The Eleventh Circuit has made it clear that a "district court

cannot base the entry of summary judgment on the mere fact that the motion was unopposed,

but, rather must consider the merits of the motion."  United States v. 5800 SW 74th Ave.,

Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) (citing Dunlap v. Transamerica Occidental

Life Ins. Co., 858 F.2d 629, 632 (11th Cir. 1988) (per curiam)). But see also Wilkerson v.

Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001); Resolution Trust Corp. v. Dunmar Corp.,

43 F.3d 587, 599 (11th Cir. 1995).

To some extent, Plaintiff relies on inadmissible summary judgment evidence in his Response.  Any document to be considered for or against summary judgment, however, must be authenticated, either by an affidavit that meets the requirements of Federal Rule of Civil Procedure 56(e) or by Federal Rule of Evidence 901(a). But see United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1444 (11th Cir. 1991) (not requiring evidence produced by nonmoving party at summary judgment to be in admissible form as long as it could be reduced to admissible form at trial).  In the employment discrimination context, unverifiable conjecture, unsupported opinions, and unsubstantiated allegations of coworkers cannot suffice as viable summary judgment evidence, especially where the record contains contradictory evidence that is highly credible and properly authenticated (e.g., video surveillance). See Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 658-59 (11th Cir. 1998) (rejecting plaintiff's unverifiable, anecdotal testimony about alleged comparators); Combs v. Plantation Patterns, 106 F.3d 1519, 1532 (11th Cir. 1997) (requiring plaintiff to introduce sufficient testimony to allow fact finder to disbelieve each of employer's proffered explanations to survive summary judgment).  A district court does not need to "review all of the evidentiary materials on file," *sua sponte*, however, it "must ensure that the motion itself is supported by evidentiary materials" and, at the least, "must review all of the evidentiary materials submitted in support of the motion for summary judgment." 5800 SW 74th Ave. at 1101-1102.

## DISCUSSION

Race discrimination claim: No similarly situated employee fared better for falsification.

As a matter of law, Plaintiff cannot establish a prima facie case of employment

discrimination, because he fails to demonstrate any similarly situated employees of other races who received more favorable treatment for acts of falsification.  To establish a prima facie case under Title VII for disparate treatment stemming from discrimination, Plaintiff must show that:

> (1) he is a member of a protected class;
> (2) he was subject to an adverse employment action;
> (3) his managers treated similarly situated employees who were not members of his
>     protected class more favorably; and
> (4) he was qualified for the job.

Gillis v. Georgia Dept. of Corr., 400 F.3d 883, 887 (11th Cir. 2005).

Defendant does not dispute that Plaintiff is African-American, that he was qualified for his job up until the time he falsified his time card, and that his dismissal from FedEx qualifies as an adverse employment action.  The only issue for the Court to consider, therefore, is whether Plaintiff can demonstrate that similarly situated employees of other races received more favorable treatment than he did under the same the same circumstances.

To demonstrate disparate treatment with regard to his discharge for falsification, Plaintiff would need to show that he is similarly situated to a non-African-American in nearly identical respects. See Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).  The same decision-makers must be involved and the circumstances must be of the same nature. Id. The Eleventh Circuit has set a high standard that "require[s] that the quality and quantity of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

The only potential comparator cited in Plaintiff's response–and, indeed, Plaintiff's only serious attempt at showing disparate treatment by FedEx–involves the termination of Kimberly

Davis.  Davis is a white female who was similarly situated in that she falsified her time card. She did not, however, receive more favorable treatment.  Like Plaintiff, she too was fired for her misconduct.

On October 24, 2005, Davis, who was running late to her job as a customer service agent in FedEx's Macon Station, called co-worker Lisa Crowder and asked Crowder "to cover" for her since she had already received multiple warnings from management regarding her punctuality. (Connell Dep. at pp. 18-22).  As it was her job to do, Crowder later "keyed in" Davis's time card information, which Davis had falsified to reflect a start time earlier than her actual arrival. Id. FedEx manager, Monty Connell, who took no part in the investigation or termination of Plaintiff, fired Davis for her misconduct. Id.

Plaintiff argues that Davis received more favorable treatment, because the reason stated in her file for her termination was her failure to meet FedEx's punctuality standard–not falsification.  It is undisputed, however, that this was Davis's third reprimand for tardiness. FedEx policy required termination under these circumstances because these three violations occurred within the same twelve-month period.  FedEx does not dispute that the company could alternatively have fired Davis for falsification.  Nonetheless, the record certainly is not as clear-cut with regard to Ms. Davis's falsification as it is concerning Plaintiff's (i.e., no video evidence).  Either way, the result is the same: She was fired for her misconduct just like Plaintiff.

As to Plaintiff's contention that termination for tardiness will hurt Davis's future employment prospects less than Plaintiff's dismissal for falsification, Plaintiff's own experience holding several respectable positions since leaving FedEx contradicts this charge.  In addition to holding jobs similar to his position as a courier at FedEx since he was fired, Plaintiff has been

13

hired for at least two service industry positions: first, as a patient account representative, and second, as a customer service representative. There is absolutely no record evidence that Plaintiff could have fared any better on the job market if the terms of his dismissal had varied. Nor does Plaintiff present evidence as to Ms. Davis's post-FedEx career prospects. No court or jury could legitimately assess the proposition that despite Plaintiff's solid resume his career would be in even better shape had FedEx fired him on different grounds. There are simply too many variables affecting one's career path and comprising such employment decisions. These issues would present prohibitive problems of proof, which would make any inferences to be drawn therefrom highly dubious. The fact remains in the end that both Plaintiff and Davis were terminated for their respective acts of misconduct. FedEx legitimately fired Davis for repeated tardiness and Plaintiff for falsifying his time card.

Plaintiff also asserts that his treatment should be compared to that of Lisa Crowder, who is also white and remained at FedEx after the incident with Davis. Unlike Plaintiff, however, there is no indication that Crowder falsified any company document. Although she entered the time card information that Davis had falsified, it was her job to do so. There is no credible evidence in the record that she had either the knowledge or intent to falsify the time card. Even if she knew the time on Davis's card was incorrect, it is undisputed that management has the responsibility for auditing time card information. Crowder could reasonably have believed that management had consented to the earlier start time reflected on Davis's time card.

Regardless of her intentions, Crowder is not similarly situated to Plaintiff. She held a different position with very different job responsibilities; she was disciplined by a different supervisor; and the activity in question was of a different quality. See Maniccia at 1368. Keying

in someone else's time card among many others as part of a business routine is very different from actively forging one's own hours and then certifying it with a personally-affixed, handwritten signature.

Video evidence confirmed Plaintiff's scheme to falsify his time card with the assistance of a co-worker.  At most, Crowder made a judgment error by agreeing to cover for Davis.  There is no record evidence of any intent on her part to falsify a company document, so it was reasonable for FedEx management to conclude not to terminate her for falsification. Id.

Plaintiff cites only the foregoing example as a potential comparator in his brief, but he deposed many other FedEx employees in an attempt to uncover a similarly situated non-African-American for this case.  Most of these instances are facially dissimilar.  None portrays FedEx treating a sufficiently similarly situated non-African-American employee any differently for the falsification of time card information.  Some of the depositions and statements filed by Plaintiff in opposition to this motion are so unrelated to this issue as to create the appearance that Plaintiff's counsel would prefer litigating these tangential matters to his own client's claims. Perhaps this is because the facts as they relate to Plaintiff do not sustain a cause of action.  In short, Plaintiff's exhaustive investigation failed to uncover anything close to a proper comparator for this case.

Five of Plaintiff's proffered comparators involved white couriers who entered the wrong exception code when they failed to deliver a package. (Evans Dep. III at pp. 70, 75, 102-104; Britton Dec. at ¶¶ 23, 26, Ex. 12).  Plaintiff claims that these acts constituted falsification, and since none of these employees were fired under FedEx's zero tolerance policy, that Plaintiff was treated differently.  Even if the situation were sufficiently similar, there is no record evidence

that these couriers intentionally falsified the codes in question.  In fact, the undisputed evidence shows that they all believed that they were using the proper code at the time.  Mere mistakes or even poor job performance do not constitute deliberate falsification.

As the examples continue, Plaintiff's comparisons become more and more attenuated. Plaintiff discovered another courier who delivered a package and entered the "signature release" code even though he had failed to obtain the recipient's signature. (Britton Dec. at ¶ 20, Ex. 10). FedEx did fire this white employee pursuant to its falsification policy and, thus, treated him the same as Plaintiff was treated for a similar violation.  During the internal appeals process, however, the employee presented evidence that damage to the package's air bill had prevented it from scanning properly to reveal the "signature release" requirement.  Thus, FedEx ultimately reinstated the employee, since he had not, in fact, deliberately falsified the company record in question.  A company's correction of a decision to dismiss an employee that turns out to have been based on a false premise is not disparate treatment.

To round out his parade of unlikely comparators, Plaintiff accuses a host of other FedEx employees of misconduct without bothering to invoke the support of any competent summary judgment evidence.  Plaintiff's unsubstantiated allegations range from pure conjecture to unsupported opinion.  Two employees that allegedly did not appear on certain surveillance footage must also have falsified their time cards without recourse.  Another who supposedly entered an incorrect package code must have falsified company documents without consequence. Finally, because Plaintiff believes one white employee delivered radioactive materials without the proper safety certification, Plaintiff concludes not only that this employee must have falsified the corresponding paperwork but also that the company failed to punish him for his act of

falsification.  Plaintiff's list of potential comparators has neither merit nor credibility.

Race retaliation claim: Plaintiff can establish no causal link in support of this claim.

Plaintiff cannot succeed in his retaliation claim, because he fails to show a causal link between his protected conduct and the adverse employment action.  To establish a prima facie case for Title VII retaliation, Plaintiff must show that:

(1) he engaged in a statutorily protected conduct or expression;
(2) he suffered an adverse employment action subsequent to such activity; and
(3) a causal link arose between the protected conduct and the adverse action.

Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000).  Fedex concedes that Plaintiff did, in fact, engage in protected activity and that he suffered an adverse employment action when the company fired him for falsification.

Without a causal connection, a claim for retaliation cannot succeed. See Little v. United Technologies, 103 F.3d 956, 959 (11th Cir. 1997).  While timing is important to this analysis, the "close proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Hankins v. AirTran Airways, Inc., 2007 U.S. App. LEXIS 13908, *17 (11th Cir. June 14, 2007).

Employee misconduct can also act to break any causal inference that may otherwise have arisen. See Hankins, 2007 U.S. Dist. LEXIS at *18-19 (finding no causal connection where plaintiff engaged in misconduct just five days after she complained and "broke the causal chain"); Kiel v. Select Artificials, 169 F.3d 1131, 1136 (8th Cir. 1999) (finding lack of causal link where plaintiff's "intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination"); Taylor v. CSX Transp., 418 F.Supp.2d 1284, 1312 (M.D.Ala. 2006) ("An employer who learns of…a

work rule violation should not have to refrain from taking investigative and disciplinary action merely because the employee also recently engaged in protected conduct.").

Plaintiff has pointed to no credible record evidence to dispute that FedEx fired him for any reason other than the company's belief that he falsified his time card.  The record does reflect a long history of grievances filed by Plaintiff against FedEx.  Yet Defendant had never previously retaliated against Plaintiff during the seventeen years he had routinely spoken out against the company. (FedEx SMF ¶¶ 5-6).  In fact, FedEx repeatedly praised Plaintiff for his job performance during this time. Id.  Plaintiff's apparent uncertainty regarding what expression led to the alleged retaliation only underscores the lack of any evidence of causation.

About a week before his dismissal, Plaintiff met with FedEx Human Resources as part of its investigation of another employee.  During the wide-ranging discussion that ensued, Plaintiff voiced a number of his latest complaints with the company.  Whether or not this conversation qualified as protected conduct from which retaliation could have occurred, Plaintiff's later falsification would have acted to break any potential causal chain between the complaints and his dismissal. Hankins at *18-19.

Six months earlier, Plaintiff had lodged a grievance against his supervisor, which led the company to reprimand Evans.  This next most recent act of protected conduct cannot be the basis for any retaliation claim by Plaintiff.  As a matter of law, this conduct is too distant in time from Plaintiff's dismissal to qualify, for the purposes of Title VII, as the proximate cause of his termination. See Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1029 (11th Cir. 2008) (finding six month delay between expression and alleged retaliation too long to establish necessary causal connection).

Even assuming both the earlier complaint against Evans and the later interview with Human Resources could support an inference of retaliation, Plaintiff has offered no explanation for why his protected expression suddenly provoked a dramatic and different response from FedEx.  After all, Plaintiff had continuously lodged nearly identical complaints against the company throughout most of his seventeen years as an employee.

Plaintiff admits that his supervisors did not say anything of a retaliatory nature to him after his interview with Human Resources. (Henderson Dep. III at p. 95).  Nor did anyone in FedEx management even mention the interview. Id.  There is no evidence that any of Plaintiff's supervisors even knew the meeting took place, much less that the interview had covered such diverse and charged topics.  Evans further testified that he only became aware of Plaintiff as the author of the earlier complaint against him after Plaintiff was dismissed from FedEx. (Evans Dep. I at pp. 32-36; Evans Dep. II at pp. 6-7).

Because the evidence of Plaintiff's falsification was a superseding cause for his dismissal, FedEx management could, however, have fired Plaintiff even if they knew of both complaints and had assumed both were protected activity. As already noted, Plaintiff's falsification of his time card gave FedEx legitimate grounds for termination independent of any knowledge the company may have had regarding Plaintiff's protected activities. See, e.g., Taylor at 1312.  Thus, Plaintiff cannot sustain his claim for retaliation.

Disability Claims: Plaintiff has shown no evidence of disability.

Plaintiff may not intend to pursue his ADA claims because he did not respond to Defendant's Motion on these issues.  Regardless, these claims do not create a genuine issue of material fact, because Plaintiff cannot show he suffered from a disability at the time of his

dismissal from FedEx.

For the purposes of the ADA , a disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities[.]" 42 U.S.C. § 12102(2)(A); Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1280 (11th Cir. 2005).  The ADA regulations further define "major life activities" as those functions that the average person in the general population can perform with little or no difficulty, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2008).  A disability that "substantially limits" means one is "[un]able to perform a major life activity that the average person in the general population can perform" or "[s]ignficantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i), (ii)(2008).

Plaintiff's condition did not satisfy this definition of disability.[1]  The major life activity in this case is the capability to work.  There is no record evidence to suggest Plaintiff's ability to perform his job was significantly restricted in any way or that he was unable to perform as well as the average courier.  Plaintiff has produced nothing to indicate FedEx management perceived

---

[1]Nor do the recently enacted amendments to the ADA help Plaintiff.  In 2008, Congress adopted new language, which provides that "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals." Pub. L. 110-325, § 4(a).  The Eleventh Circuit recently held that this amendment is not retroactive because "absent Congressional expression to the contrary, a presumption against retroactive application applies when the new legislation would 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" Fikes v. Wal-Mart, Inc., 2009 U.S. App. LEXIS 7669, *1-2, n. 1 (11th Cir. April 10, 2009) (quoting Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994)).

any job performance issues. Prior to the act of falsification, his record at FedEx reflects only positive reviews in this regard.

No physician ever classified Plaintiff as disabled.  A back injury, by itself, does not constitute a disability.  See Standard v. A.B.E.L. Svcs., Inc., 161 F.3d 1318, 1327.  Although Plaintiff spent most of the summer of 2005 on medical leave, his doctors had released him for full-duty work in late August.

Even where not made by a physician, a disability determination must be objectively reasonable.  Plaintiff's own subjective self-assessment that he "was unable to really do [his] job like [he] really needed to" does not show a substantial limitation on his ability to work. See id. at 1328 (requiring belief of disability to be "objectively reasonable").  Since Plaintiff points to no objective evidence that he suffered from a disability at the time of his dismissal from FedEx, his ADA claim against Defendant fails as a matter of law.

Plaintiff's ability to perform many other jobs precludes recovery on a disability theory. Assuming, *arguendo*, Plaintiff suffered from a physical impairment that precluded him from performing the job of a FedEx courier, it does not necessarily follow, under the ADA, that he was substantially limited in the major life activity of working generally. 29 C.F.R. § 1630.2(j)(3)(i).  Plaintiff has the education, skill, and ability to perform many jobs.  Since FedEx fired him, he has worked in numerous positions as a delivery driver, trucking supervisor, customer service representative, and patient account representative.  Thus, as a matter of law, Plaintiff cannot show that his termination resulted from any disability.

Even if Plaintiff could show he suffered from a disability in September 2005, he cannot show either that FedEx refused to accommodate him or that the company fired him because of

that disability.  Again, Plaintiff did not address these issues at all in his Response brief to

Defendant's Motion for Summary Judgment.  From the record, however, the Court can find no

evidence that FedEx failed to reasonably accommodate Plaintiff's requests to attend physical

therapy.  Simply asking Plaintiff to schedule these appointments outside his work schedule,

especially when his normal workday ends well before the typical doctor's office would close for

the day, is not unreasonable.

 Nor has Plaintiff created a question of fact as to whether his alleged disability was a

substantial or motivating factor in prompting FedEx to terminate his employment. See Doe v.

DeKalb County School Dist., 145 F.3d 1441, 1448 (11th Cir. 1998).  The Court can find no

evidence of non-disabled employees who were treated more favorably and no evidence of a

retaliatory motive in Defendant.  What is clear from the record is that FedEx had a legitimate,

non-discriminatory reason to fire Plaintiff for falsifying his time card.


Defendant had a legitimate, nondiscriminatory reason for firing Plaintiff on grounds of
falsification.

 The Court need not consider Plaintiff's claims of pretext, having already determined that

his prima facie claims for discrimination fail as a matter of law.  Nonetheless, Defendant's

reason for firing Plaintiff on grounds that he falsified his time card qualifies as a legitimate,

nondiscriminatory reason for his dismissal from FedEx. See Hampton v. City of South Miami,

2006 U.S. App. LEXIS 18567, *9 (11th Cir. July 25, 2006); Crawford v. Chao, 2005 U.S. App.

26935, *7-8 (11th Cir. Dec. 7, 2005); Geran v. McMillan, 2008 U.S. Dist. 23820, *22 (N.D. Ga.

March 25, 2008); Suber v. Seminole County, 78 F. Supp. 2d 1298, 1305 (M.D. Fla. 1999).

Video evidence showed Plaintiff's act of falsification, and Plaintiff has pointed to no record

evidence that could raise a genuine issue of material fact as to the authenticity of the surveillance tape or credibility of FedEx's determination to fire him on these grounds.  As such, Plaintiff could not sustain his claims for discrimination even if he could establish a prima facie case.

## CONCLUSION

For the foregoing reason, Defendant's Motion for Summary Judgment [Doc. 37] is **GRANTED**.  The record evidence reveals no genuine issues of material fact for trial.  As a matter of law, therefore, Plaintiff's claims for race and disability discrimination fail.  The Clerk is directed to enter **JUDGMENT** in favor of Defendant as to all claims.

**SO ORDERED,** this 26th day of March, 2010.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

THC/chw